UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT HUDSON, | ) | |
| | ) | |
| Petitioner, | ) | No. 13 C 00678 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| RICK HARRINGTON, Warden | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Robert Hudson has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254,[1] challenging his 2005 convictions for armed robbery and unlawful restraint. Hudson raises one claim in support of the petition: that the Illinois Appellate Court unreasonably concluded that he was not denied the right to the effective assistance of counsel during plea negotiations. Even in light of the deferential review given to state-court decisions, Hudson is right: his lawyer was ineffective in failing to advise Hudson that, if convicted of the charged offenses, Hudson was subject to a *mandatory* life sentence. And Hudson has proven that he would have accepted the State's plea deal, instead of proceeding to trial, if he had known about the mandatory life sentence. For the reasons that follow, Hudson's petition [R. 1] is granted.

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 2241. Citations to the docket are noted as "R.," followed by the docket entry.

# I. Background

When considering habeas petitions, federal courts must presume that the factual findings made by the last state court to decide the case on the merits are correct unless the petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Where Hudson has not provided clear and convincing evidence to rebut the presumption of correctness, the following factual background is taken from the state court's findings.

## A. Summary of the Crime

On December 24, 2004, Hudson and an accomplice entered the I-55 Greater Chicago Truck Plaza. *People v. Hudson*, No. 3-07-0596, slip op. at 1-2 (Ill. App. Ct. June 23, 2009), *available at* R. 16-1, State's Exh. A. Brandishing a gun, Hudson insisted that an employee of the Truck Plaza open a safe from which Hudson pocketed money. *Id.* Before leaving the Truck Plaza, Hudson forced three employees into a bathroom and restrained them with duct tape. *Id.* at 2. Hudson and his accomplice were caught by the police shortly after the robbery. *Id.*

## B. Pre-Trial Procedure

In Illinois state court, Hudson was indicted for armed robbery, a Class X felony, and three counts of unlawful restraint, Class 4 felonies. *Id.* at 1. The trial judge appointed Alexander Beck to represent Hudson. *Id.* at 2-3.

At a hearing on December 27, 2004, the trial judge (incorrectly) informed Hudson that Hudson could be sentenced to between six to thirty years in prison for

armed robbery and that ultimately Hudson could be eligible for an extended-term sentence of between six and sixty years if he was convicted, depending on the circumstances of the crime and his prior criminal history. *Id.* at 2. But sixty years was not the maximum; in fact, Hudson's actual sentencing exposure was *mandatory life imprisonment.*

The very next day, Hudson was interviewed by Stacy DeWald, an investigator with the Will County Public Defender's Office, as part of his intake as a client of that office. *Id.*; *see also* Tr. at 586-88, 623.[2] The record does not reflect the specific questions DeWald asked Hudson or his exact answers, but DeWald did fill out a "Public Defenders Investigative Sheet." R. 16-2, State's Exh. B. at C000192 (index of exhibits displaying the form's title). This intake form stated that Hudson did not complete high school, was addicted to heroin, and was medicated for heroin withdrawal at the time of the intake interview. R. 4, Pet'r's Br. at 5 (citing the form, without dispute by the State). The intake form also notes that Hudson informed DeWald that Hudson had previously been convicted for unlawful possession, murder, and theft (with a question mark following the theft notation). *Id.* Next to the word "alias," DeWald wrote "∅." *Id.*; *see also Hudson*, No. 3-07-0596, slip op. at 2.

Approximately one month later, Beck received a copy of Hudson's fingerprint-generated LEADS criminal-history record. Pet'r's Br. at 5; Pet. Leave Appeal, Pet'r's App. at A-1, *People v. Hudson*, No. 108875 (Ill.), *available at* R. 16-9, State's Exh. F.

_____

[2]Citations to the state-court transcript (which is found at R. 16-5, 16-6, 16-7, and 16-8) are designated "Tr." and then the Bates number that is found in the bottom right corner of the corresponding state-court documents.

The LEADS printout lists the convictions linked to Hudson's fingerprints, and notes on the first page that Hudson had been convicted *six* times—three more than noted on DeWald's intake form. *Id.* at A-1. The first page of the LEADS printout also notes that some of this criminal activity was recorded under the "ALIAS NAME" of "Hudson, Mark" and the "ALIAS DOB" of November 11, 1957 (Hudson's actual birthdate is December 11, 1957). *Id.*; *see also Hudson*, No. 3-07-0596, slip op. at 2. This information was repeated on pages two, three, and twelve of the LEADS report. *See* Pet. Leave Appeal, Pet'r's App. at A-2, A-3, A-12, *Hudson*, No. 108875. Both of Hudson's theft convictions were recorded under his November 11, 1957 alias date of birth, and one of these convictions was also recorded under his alias name. *Id.* at A-7, A-8.

Hudson requested an Illinois Rule 402 plea-discussion conference at his pre-trial hearing. *Hudson*, No. 3-07-0596, slip op. at 2. On March 23, 2005 (on the same date as his pre-trial hearing), the conference was conducted, with the trial court, prosecution, and Beck evaluating Hudson's criminal history and discussing the range of his sentencing exposure. *Id.* Afterwards, Beck instructed Hudson (incorrectly) that, if he was convicted of the charged offenses, Hudson would be subject to an extended-term sentence of six to sixty years as a result of his criminal history record, with a most likely sentence of forty-four years. *Id.* Hudson was also informed (incorrectly) by Beck that his sentencing range would be three to fourteen years if he were convicted of simple robbery rather than armed robbery. Pet'r's Br.

at 6 (citing R. 16-2, State's Exh. B at C000189). In reality, as discussed below, Hudson actually was facing a *mandatory* life sentence.

As Hudson proceeded towards trial, the prosecution offered him diminishing sentences contingent on his pleading, from a twenty-year sentence, to an eighteen-year sentence on a Class 1 felony, to, finally, a seventeen-year sentence on a Class X felony. *Hudson*, No. 3-07-0596, slip op. at 2. Hudson ultimately rejected each of these offers. *Id.* Before trial began, the judge admonished Hudson (incorrectly) again that an armed-robbery conviction would subject Hudson to a prison term of six to sixty years. *Id.* at 3. Hudson nevertheless elected to go to trial. *Id.* While the jury was deliberating, the prosecution offered Hudson a sixteen-year sentence, which he rejected. *Id.* The jury convicted Hudson of armed robbery and three counts of unlawful restraint. *Id.*

### C. Post-Trial Procedure

Following Hudson's conviction, in preparation for his sentencing hearing, the trial court ordered the preparation of a presentence investigation. *Id.* Julie Ippolito, a probation officer with the Will County Adult Probation Department, reviewed Hudson's LEADS report—the same report that was reviewed by Beck and the same report that was used at Hudson's Rule 402 conference—and determined that Hudson had *two* prior Class X convictions for armed robbery, which he committed when he was a teenager. *See id.*; *see also* Tr. at 738-43. Therefore, under the since-repealed, but then-effective Illinois Habitual Criminal Act, 720 ILCS 5/33B-1, Hudson was actually subject to a mandatory natural-life sentence. *Hudson*, No. 3-

07-0596, slip op. at 3. At the time, Hudson refused to submit fingerprints to confirm that the offenses reflected on his LEADS report were attributable to him, so the court continued the sentencing hearing to allow the probation department to obtain the 1979 archived convictions and incorporate them into the presentence-investigation report. *Id.*

On August 16, 2005, Hudson filed a *pro se* motion for new trial on the basis that his trial counsel (Beck) had failed to provide effective assistance of counsel, and that the trial judge's failure to correctly admonish him about the penalty Hudson faced was a violation of his right to due process. *Id.*; *see also* R. 16-2, State's Exh. B at C000148. At that point, the trial judge appointed Hudson new counsel, Raymond Nash, to investigate these claims. *Hudson*, No. 3-07-0596, slip op. at 3. Nash filed another motion for new trial for ineffective assistance of counsel, alleging that Beck failed to conduct an adequate investigation of Hudson's criminal history and thus failed to advise Hudson of the true consequences of a decision to plead "not guilty." *Id.* at 3-4; *see also* R. 16-2, State's Exh. B at C000186. The motion asserted that Hudson would have accepted the State's sixteen-year offer during jury deliberations had Beck correctly informed Hudson that he faced a mandatory natural-life sentence if convicted. *Hudson*, No. 3-07-0596, slip op. at 4; *see also* R. 16-2, State's Exh. B at C000189. Hudson also entered into plea negotiations once again with the prosecution, although the prosecution ultimately declined to renew a plea offer. *See* Tr. at 545.

The state court held an evidentiary hearing on April 25, 2007, during which Hudson testified that he rejected the prosecution's plea offers because he was not informed by Beck, the trial court, or the prosecution, that, if convicted of armed robbery, he would be subject to a mandatory natural-life sentence. *Hudson*, No. 3-07-0596, slip op. at 4-5. Beck did not testify at this hearing; instead, the parties agreed to a stipulation of what his testimony would have been. *Id.* at 4; *see also* R. 16-2, State's Exh. B at C000194, Stipulation. The parties stipulated that Beck "received and reviewed" Hudson's LEADS printout before the trial and that the LEADS criminal-history report was fingerprint-generated. Stipulation ¶¶ 3-4. But the stipulation stated that Beck did not realize that all of the convictions in the printout were attributable to Hudson. *Id.* ¶ 6. The parties also stipulated that Beck "saw [DeWald's] form," which was the intake form from the Public Defender's Office. *Id.* ¶ 8. At the hearing, DeWald testified that she had no specific memory of her intake interview with Hudson, but that she typically relied on the answers given by the clients about their criminal history and recorded whatever the clients could remember at the time. *See Hudson*, No. 3-07-0596, slip op. at 5; Tr. at 635.

On May 9, 2007, the trial court denied Hudson's motion for a new trial and sentenced him to natural life in prison. *Hudson*, No. 3-07-0596, slip op. at 5. Hudson appealed, arguing, again, that he was denied the effective assistance of counsel during plea negotiations when Beck failed to discover he was subject to a mandatory natural-life sentence. *Id.* at 6. The Illinois Appellate Court affirmed Hudson's conviction and sentence, finding that Hudson, "in an effort to minimize his

prior criminal history informed the public defender's office, through their investigator, of his criminal history only that is accurately reflected in his real name and real date of birth." *Id.* at 7 (internal quotation marks omitted). The Illinois Appellate Court also concluded that Hudson "concealed his prior record and denied previously using an alias name," and that "Beck compared the information in the investigator's form against the LEADS printout, which indicated that the convictions defendant revealed to the public defender's investigator mirrored the convictions attributed to Robert Hudson and his actual date of birth." *Id.* Finally, the Appellate Court decided that "Beck reasonably relied upon these falsehoods in concluding that there was no connection between defendant and Mark Hudson." *Id.* Therefore, the Appellate Court concluded, Beck "cannot now be said to be ineffective for failing to discover information that his client controlled and chose to withhold from defense counsel." *Id.* Having determined that Beck's performance was not ineffective under *Strickland*, the Appellate Court did not address the prejudice element of *Strickland. Id.* at 7-8.

Following the Illinois Appellate Court's decision, Hudson sought a Petition for Leave to Appeal from the Illinois Supreme Court arguing, once again, that he was denied the effective assistance of counsel during plea negotiations. *See* Pet. Leave Appeal, *People v. Hudson*, No. 108875. The Illinois Supreme Court denied Hudson's petition. *People v. Hudson*, No. 108875 (Ill. Sept. 30, 2009), *available at* R. 16-10, State's Exh. G.

On March 22, 2010, Hudson timely filed a *pro se* petition for state post-conviction relief, arguing that the application of the Habitual Criminal Act to him was predicated on an error of statutory interpretation, that his counsel was constitutionally ineffective for failing to argue as much, and that the application of the Act was in violation of the Ex Post Facto Clause of the United States and Illinois Constitutions. *See* R. 16-4, State's Exh. B at C000349. His petition was dismissed by the post-conviction trial court, and he timely moved *pro se* for reconsideration. *See* Tr. at 792; R. 16-4, State's Exh. B at C000384. That motion, too, was denied by the trial court. R. 16-4, State's Exh. B at C000393. Hudson timely filed a notice of appeal with the Illinois Appellate Court, *id.* at C000395, which denied relief on Hudson's state post-conviction claims, *People v. Hudson*, No. 3-10-0485, 2012 WL 6971019 (Ill. App. Ct. Apr. 24, 2012). Hudson petitioned for leave to appeal with the Illinois Supreme Court, but that too was denied. Pet. Leave Appeal, *People v. Hudson*, No. 114365 (Ill. May 25, 2012), *available at* R. 16-10, State's Exh. L; *People v. Hudson*, No. 114365 (Ill. Sept. 10, 2012), *available at* R. 16-10, State's Exh. M.

Hudson now petitions for a writ of habeas corpus raising one claim: the Illinois Appellate Court's determination that he was not denied effective assistance of counsel was based on an unreasonable determination of the facts in light of the evidence presented and was based on an unreasonable application of clearly established federal law.

## II. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, a state petitioner seeking a writ of habeas corpus in federal court must first exhaust remedies available in state court, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights," *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (internal quotation marks and citation omitted). The habeas petitioner must fully and fairly present federal claims through one complete round of the state appellate review process before filing a federal habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Even if fairly presented, however, a federal court may not grant habeas relief unless the state court's decision was (1) contrary to, or (2) an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). A state court's decision is contrary to clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision would be an unreasonable application of clearly established federal law as determined by the United States Supreme Court if the habeas petitioner demonstrated that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *Id.* The test for reasonable application is objective, *see Lockyer v.*

*Andrade*, 538 U.S. 63, 75-76 (2003), and "is a difficult standard to meet; 'unreasonable' means 'something like lying well outside the boundaries of permissible differences of opinion,'" *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)). Where the last reasoned state court opinion does not evaluate a claim, however, this Court reviews that claim *de novo. Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

Finally, a state court's factual determinations must also be evaluated against the unreasonableness standard. 28 U.S.C. § 2254(d)(2). A state court's factual determinations are presumed correct, 28 U.S.C. § 2254(e)(1); therefore, merely asserting that the state court committed error is not enough to overturn factual findings, *Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003). Instead, the petitioner could show, by clear and convincing evidence, that the state court determined the facts incorrectly. 28 U.S.C. § 2254(e)(1); *see also Ward*, 334 F.3d at 704. Such a decision would be "by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable." *Ward*, 334 F.3d at 704 (quoting *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997)).

### III. Analysis

Under AEDPA, the relevant decision for review is the decision of the last state court to rule on the merits of the petitioner's claims. *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011). Here, the last relevant decision is the June 2009 Illinois Appellate Court's decision to affirm the state trial court.

### A. Unreasonable Determination of Facts

The Court first considers whether the Illinois Appellate Court's decision was based on an unreasonable determination of the facts in light of the evidence presented. Hudson has provided clear and convincing evidence, *Julian v. Bartley*, 495 F.3d 487, 492 (7th Cir. 2007); 28 U.S.C. § 2254(e)(1), showing that the Illinois Appellate Court did just that.

The Illinois Appellate Court's error arises from its statement that "[Hudson] . . . in an effort to minimize his prior criminal history informed the public defender's office, through their investigator, of his criminal history only that is accurately reflected in his real name *and real date of birth*." *Hudson*, No. 3-07-0596, slip op. at 7 (emphasis added) (internal quotation marks omitted). The record undisputedly shows that Hudson informed DeWald of his convictions for unlawful possession, murder, and theft. Pet'r's Br. at 4-5; R. 15, Answer at 4. And, as Hudson's LEADS printout indicates, Hudson's sole conviction for homicide is reflected under the November 11, 1957 *alias* date of birth. *See* Pet. Leave Appeal, Pet'r's App. at A-1, *Hudson*, No. 108875. In other words, during the intake interview, Hudson *did* report a conviction for which he was convicted under an alias date of birth, contrary to the state court's finding. Moreover, the LEADS printout shows that Hudson was convicted twice of theft, once under his "Hudson, Mark" alias name and on *both* occasions under his November 11, 1957 alias date of birth. *Id*. At this point, in this federal habeas litigation, none of this is disputed by the State. This constitutes "clear and convincing evidence" to rebut the Illinois

Appellate Court's conclusion that Hudson only informed the public defender's office of his criminal history as reflected by his real name and his real date of birth.

Hudson also points to two other purported factual errors by the Illinois Appellate Court. He has not, however, met his burden of providing clear and convincing evidence to rebut these two factual conclusions. First, Hudson argues that the Appellate Court erred in concluding that "Beck compared the information in the investigator's form against the LEADS printout." *Hudson*, No. 3-07-0596, slip op. at 7. This is an extremely close question. Remember that Beck did not testify in-court on the new-trial motion; instead, the parties entered into a stipulation. It is the imprecise wording of the stipulation that makes this a close call. With regard to the LEADS report, the stipulation submitted by the parties states that "Beck received and *reviewed* a print-out of defendant's criminal history as summarized by LEADS." Stipulation ¶ 3 (emphasis added). With regard to the Public Defender's investigative form, the stipulation says that "Beck was told that an investigator from the Will County Public Defender's Office interviewed defendant . . . [and] wrote on a form that defendant had three possible priors . . . . Beck *saw* the investigator's form." *Id.* ¶ 8 (emphasis added). Thus, according to this stipulation, whereas Beck "reviewed" the LEADS printout, he merely "saw" DeWald's intake form. And nowhere is it expressly stated that Beck *compared* the LEADS printout with the intake form. Having said all this, state courts are permitted to draw reasonable inferences from written stipulations (after all, Hudson agreed to proceed by way of stipulation in state court). The Illinois Appellate Court could, without

committing a clear and convincing error, infer that Beck did compare the LEADS report with the intake form where his stipulation says he "review[ed]" one and "saw" the other. Beck's having "saw" one document and "reviewed" another is, at the very least, consistent with his having compared these two documents. In light of the deference due to the Illinois Appellate Court's decision on habeas review, this Court cannot say that its conclusion is rebutted by "clear and convincing evidence." *Julian*, 495 F.3d at 492.

Second, Hudson argues that the Illinois Court of Appeals erred in concluding that he "concealed his prior record and denied previously using an alias name." *Hudson*, No. 3-07-0596, slip op. at 7. Turning first to whether Hudson "concealed his prior record," there is no direct evidence that Hudson did anything in the time before trial to *affirmatively* prevent others from discovering his prior record. And, in fact, the State's prosecutor admitted during the new-trial hearing that "[w]e have no evidence of an affirmative misstatement by this defendant here." Tr. at 670. Yet, there is similarly no evidence that contradicts the inference that Hudson did omit reciting his entire criminal history. Instead, the record is consistent with the conclusion that Hudson did not inform DeWald of each of Hudson's prior convictions. This might be because Hudson forgot, or because he was confused at the time (he was going through heroin withdrawal at the time of this intake interview, Pet'r's Br. at 5), or perhaps he was intentionally omitting the prior convictions. The bottom line is that there was evidence that Hudson gave an incomplete account of his criminal history. There is no "clear and convincing"

evidence on the record that rebuts the conclusion that Hudson concealed his prior record by omission.

Turning second to whether Hudson "denied previously using an alias name," this conclusion similarly cannot be overturned on habeas review. Here, the Illinois Appellate Court presumably relied on (as the state trial court did) DeWald's notation of "Ø" next to the question of alias on the intake form, together with the reflection of only three of Hudson's crimes on the intake form. Beck's stipulation notes that he "did not personally ask defendant whether those convictions were in fact convictions of defendant." Stipulation ¶ 7. To be sure, as Hudson points out in his brief, the "Ø" symbol might suggest that DeWald never asked Hudson about his use of an alias. R. 20, Pet'r's Reply Br. at 10-11. And, as Hudson also argues, the state court's reliance on this symbol to conclude that Hudson "denied previously using an alias" is further undermined by DeWald's only other use of the symbol on the intake form: DeWald writes "Ø" next to "Alcohol/Drug Treatment" despite also noting that Hudson *was* undergoing drug treatment in the same part of the intake form. Answer at 15. But these arguments are not so persuasive that the Appellate Court's conclusion can be deemed to be wrong by "clear and convincing" evidence. The fact is that the null-set symbol written next to "alias" on the intake form gives rise to the reasonable inference—indeed, it is the most natural inference—that DeWald asked Hudson about the use of an alias, and he answered no.

## B. Application of *Strickland*

With the facts set—including the fact that Hudson did report on the intake form that he had convictions that were entered under his alias name and alias date of birth—it is time to consider whether the Illinois Appellate Court applied *Strickland* unreasonably in deciding that Hudson was not deprived of his constitutional right to effective counsel in plea negotiations. To establish that his trial counsel was constitutionally ineffective, Hudson must show both that "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

On the question of adequate performance, the Illinois Appellate Court unreasonably determined that Beck performed adequately. In *Rompilla*, the Supreme Court considered the reasonableness of a defense lawyer's failure to investigate the circumstances of the defendant's case (specifically, the court file on Rompilla's prior conviction). 545 U.S. at 390. Rompilla, the criminal defendant, was actively unhelpful to this investigation, going so far as even giving his lawyer false leads. *Id.* at 381. Yet, as the Supreme Court concluded, Rompilla's "counsel's failure to look at the file fell below the line of reasonable practice." *Id.* at 390. The Supreme Court acknowledged that an evaluation of attorney performance "spawns few hard-edged rules," *id.* at 381, but nevertheless there were enough problems with counsel's performance to justify a finding of unreasonableness: "the ease with which counsel could examine the entire file," *id.* at 386 n.4, the failure to meet the

American Bar Association's standards for defense representation, *id.* at 387, and the defense lawyer knew "that the prosecutor intend[ed] to use a prior conviction in this way," *id.* at 390.

Many of the problems in *Rompilla* apply here. The ease with which Beck could have discovered Hudson's complete criminal history is, if anything, greater than that considered in *Rompilla*. *Id.* at 386 n.4 (noting that the lack of effort required for Rompilla's attorney to conduct the necessary investigation rendered Rompilla's case "correspondingly easy"). Beck actually received the LEADS report that stated, in several places, Hudson's alias name and alias date of birth, and of course stated the complete criminal history as generated by his *fingerprints*, in contrast to a self-report at an intake interview. And even a cursory examination of the *front* page of the printout would have revealed that "Hudson, Robert" and "Hudson, Mark" were the same person—the defendant—and that both the November 11, 1957 and December 11, 1957 birthdates were associated with Hudson by fingerprints. Pet. Leave Appeal, Pet'r's App. at A-1, *Hudson*, No. 108875. Accordingly, such a review would have immediately revealed to Beck that the 1979 Class X felony convictions were attributable to his client. Thus, the extent of investigation required of Beck was for him to complete a cursory review of the first page of a document *already in his possession*. Beck's failure to do this was unacceptable.

The ABA guidelines, similarly, strongly suggest that Beck's investigation was inadequate:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. . . . The duty to investigate exists *regardless* of the accused's admissions or statements to the lawyer . . . .

*Rompilla*, 545 U.S. at 387 (emphasis added) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)). Beck's "investigation" appears limited to considering Hudson's convictions as reflected in DeWald's intake form, reviewing the LEADS report, and then disregarding the LEADS report in favor of the intake form. This does not constitute "explor[ing] all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction"—it ignores a primary (and obviously more reliable) avenue that was directly presented to Beck: the LEADS report. And, as the ABA guidelines make clear, Beck should have investigated Hudson's criminal history further, even if Hudson gave an incomplete recitation. Remember too that even Hudson's incomplete recitation did include (contrary to what the Illinois Appellate Court found) convictions for which he was convicted under an alias name and alias date of birth.

Finally, Beck was charged with knowledge that the prosecutor would use Hudson's prior convictions against him for sentencing purposes. During the Rule 402 plea-discussions conference, there was explicit discussion of the possibility of an extended term based in part on prior criminal history. What's more, this also was not a matter of discretionary use of prior criminal history: based on Hudson's prior convictions, the life sentence was *mandatory*, and neither the prosecutor nor the state trial court could alter that outcome (short of a plea).

The unreasonableness of the Illinois Appellate Court's application of *Strickland* is highlighted when considered alongside the court's unreasonable determination of fact. The Appellate Court's factual error (that Hudson was only forthcoming about his non-alias convictions) is important because it goes to the heart of the state court's rationale for determining that Beck performed reasonably: Beck, according to the state court, "cannot now be said to be ineffective for failing to discover information that his client controlled and chose to withhold from defense counsel." *Hudson*, No. 3-07-0596, slip op. at 7. But what the record actually reflects is that Hudson admitted to DeWald that he committed three crimes, *two of which were committed under an alias* according to the LEADS report. Therefore, Beck not only failed to notice the alias information, which appeared multiple times on the LEADS report, he failed to notice that Hudson himself admitted on the intake form to committing two crimes linked to an alias date of birth. This does not constitute a reasonable investigation.

Having determined that Beck performed unreasonably, the remaining question under *Strickland* is whether Hudson was prejudiced by Beck's failure. Beck's failure did prejudice Hudson. The Illinois Appellate Court only considered the performance element of *Strickland*, so this Court evaluates the prejudice issue *de novo*. *Rompilla*, 545 U.S. at 390. To show prejudice, the petitioner must demonstrate that, but for his counsel's deficiencies, he would have accepted the State's plea offer. *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). In other words, Hudson must show "that his counsel's advice was 'a decisive factor' in his decision to

reject the State's plea offer." *Watson v. Anglin*, 560 F.3d 687, 691 (7th Cir. 2009) (emphasis omitted) (quoting *United States v. Barnes*, 83 F.3d 934, 940 (7th Cir. 1996)). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 693). At the same time, the prejudice standard "does not require a showing that [the] counsel's actions 'more likely than not altered the outcome.'" *Id.* at 792 (citation omitted). In the context of a trial outcome, "prejudice has been established so long as the chances of acquittal are better than negligible." *Canaan v. McBride*, 395 F.3d 376, 386 (7th Cir. 2005); *see also Harris v. Thompson*, 698 F.3d 609, 644-45 (7th Cir. 2012). In the plea-advice setting, there is both a subjective question and an objective one. On the subjective question, "to demonstrate a reasonable probability that he would have accepted a plea, a petitioner's testimony that he would have done so must be credible." *Merzbacher v. Shearin*, 706 F.3d 356, 366-67 (4th Cir. 2013); *see also Julian*, 495 F.3d at 499. On the objective question, "if the prosecution had the discretion to cancel [the plea offer] or if the trial court had the discretion to refuse to accept it," the petitioner must show that "there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." *Overstreet v. Wilson*, 686 F.3d 404, 407 (7th Cir. 2012) (quoting *Missouri v. Frye*, 132 S. Ct. 1399, 1410 (2012)) (internal quotation marks omitted).

Here, the evidence shows that Hudson would have accepted a plea agreement if he had known he faced a mandatory natural-life sentence. Remember that the

State offered plea deals of twenty years, then eighteen, seventeen, and finally sixteen years (the last offer was during the jury's deliberations). The sixteen-year deal would have allowed for day-for-day credit, so it would be around eight years of actual imprisonment, compared to a mandatory life sentence with no possibility of parole. *Compare* 730 ILCS 5/3-6-3(a)(2-2.1) (day-for-day credit), *with* 730 ILCS 5/3-6-3(a)(2.2) (natural life without parole). That stark difference (even between the first deal of twenty years (with ten years of actual prison) and natural life) gives rise to the inference that Hudson would have accepted a plea deal.

To counter this inference, the State asserts that Hudson was informed that "if he was convicted, he would likely be sentenced to forty-four years of imprisonment," and that at his age, a "forty-four-year sentence would leave him in prison until he was ninety-one years old—effectively a life sentence." Answer at 22. Put another way, the State argues that, in effect, Hudson was already faced with the choice of the plea deals versus natural life imprisonment. But that argument does not take into account the significant legal and practical differences between a forty-four-year sentence and a natural-life sentence under Illinois law. A forty-four-year sentence for armed robbery that did not result "in great bodily harm," would have rendered Hudson eligible for day-for-day credits that could have reduced his actual imprisonment time to possibly as little as twenty-one years and nine months of imprisonment. *See* 730 ILCS 5/3-6-3(a)(2-2.1). A natural life sentence, on the other hand, means no possibility of parole and Hudson would spend the rest of his life in jail. *See* 730 ILCS 5/3-6-3(a)(2.2). This is an enormous difference. *See, e.g.*,

*Julian*, 495 F.3d at 498-99; *Moore v. Bryant*, 348 F.3d 238, 242-43 (7th Cir. 2003).[3]

Hudson has been arguing, starting with the state-court new-trial litigation, that he would have accepted one of the State's plea agreements if he had known that he was facing a natural life sentence. *See* R. 16-2, State's Exh. B at C000186. The state court has never found otherwise, and in this federal habeas litigation, the State does not now ask for an evidentiary hearing to consider Hudson's live testimony. The only argument the State has offered in response is the one discussed above, namely, that Hudson purportedly already was confronted with an effective life sentence if he rejected the plea deals. That is wrong, for the reasons already explained.[4]

The remaining question is whether the State would have withdrawn a plea deal, or if the trial court would have rejected an agreement, had the full extent of Hudson's criminal history come to light during plea negotiations. The Court concludes that the evidence shows (as adequately as any evidence can show in such a hypothetical scenario) that it is reasonably probable that the State would have made a plea offer to Hudson and the trial court would have accepted such an offer. *See Overstreet*, 686 F.3d at 407. The State made multiple, increasingly generous,

---

[3]This analysis does not even take into account the fact that Hudson was misinformed that he could get as few as six years of imprisonment if convicted. *Hudson*, No. 3-07-0596, slip op. at 4; s*ee also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 285 (7th Cir. 2002). So, as far as Hudson knew, he thought he could be convicted at trial and still ask for a sentence as low as six years, when in fact there could only be one outcome: mandatory life, no parole.

[4]In light of this finding, it is not necessary for Hudson to supplement the record with his own sworn testimony that he would have accepted one of the plea offers if he had known that he was eligible for a natural-life sentence. Hudson's Motion to Expand the Evidentiary Record [R. 32] is thus denied as unnecessary.

plea offers to Hudson as his case progressed to trial. *Hudson*, No. 3-07-0596, slip op. at 2-3; *see United States v. Daniels*, 902 F.2d 1238, 1244 (7th Cir. 1990) (noting that plea offers allow the State to avoid the "expense and uncertainty of a trial" or other future litigations). The State even made one final offer to Hudson after the trial evidence was done but before the jury rendered a verdict. *Hudson*, No. 3-07-0596, slip op. at 3. In this context, the fact that the State declined to make any renewed plea offers *after* Hudson was convicted and the full extent of Hudson's criminal history came to light is not particularly relevant evidence that the State would not have made any plea offers *before* trial or conviction. The evidence instead reflects the State's willingness, even eagerness, to entice Hudson to plead guilty. There is, similarly, no evidence that the trial judge would not have accepted a plea offer had the full extent of Hudson's criminal background been known. To be sure, the two convictions that were missed were for armed robbery, a very serious crime. But the offenses occurred in 1975 and 1976, when Hudson was a teenager. The offenses of course are still serious, but they were almost three decades in the past by the time of the plea negotiations. There is simply nothing in the record to suggest that those thirty-year-old convictions would have doomed plea negotiations, especially where the State itself made multiple offers, increasingly lenient, as the prosecution went on. It is reasonably probable that the State would have made Hudson a plea offer that he would have accepted (and that the trial court would have approved) had Beck performed reasonably.

An important question remains: what is the remedy for the ineffective assistance of trial counsel in this situation? In *Lafler v. Cooper*, the Supreme Court explained that generally there are two forms of prejudice that a criminal defendant could suffer due to ineffective assistance during plea negotiations. 132 S. Ct. at 1389. One form arises where the defendant was offered a lesser sentence on a charge (or set of charges), rejected the plea offer, and then was convicted on the same charge (or the same set of charges). In that situation, the state trial "court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between." *Id.* The second form of prejudice arises where "resentencing alone will not be full redress for the constitutional injury. If, for example, an offer was for a guilty plea to a count or counts less serious than the ones for which a defendant was convicted after trial, *or if a mandatory sentence* confines a judge's sentencing discretion after trial, a resentencing absed on the conviction at trial may not suffice." *Id.* (emphasis added). Here, as highlighted by the emphasized text, the problem is that the state sentencing judge indeed would be constrained to impose the mandatory life imprisonment term if the state court simply held a resentencing on the trial convictions. So some other relief is required than just resentencing on those convictions.

The State recognizes this problem and argues that if Hudson's petition succeeds, the proper remedy is to require the State to reoffer the first plea offer, that is, the plea to a twenty-year sentence. R. 15 at 24. The first plea offer, the State

says, "best places the parties at the beginning of the plea process. Should this Court hold that petitioner is entitled to habeas relief, it should instruct the State to reinstate the twenty-year offer." *Id.* The State is right. As it is, even the twenty-year offer did not account for the 1970s convictions, so the other, more lenient alternatives cannot possibly be the more appropriate offers to reinstate.[5] The State must reoffer the twenty-year deal, and the offer must be to a charge that would not trigger mandatory life imprisonment. After that, assuming that Hudson accepts the offer, "the state trial court can then exercise its discretion in determining whether to vacate the convictions and resentence [Hudson] pursuant to the plea agreement, to vacate only some of the convictions and resentence [Hudson] accordingly, or to leave the convictions and sentence from trial undisturbed." *Lafler*, 132 S. Ct. at 1391.

---

[5] It understandably seems odd to require reinstatement even of the twenty-year offer, because that offer too did not factor-in the two prior convictions and Hudson's exposure to mandatory life imprisonment. But it would be even more bizarre to hold that the alternative is *no* remedy for the constitutional violation, where (as here), the petitioner shows that he was unreasonably advised as to the sentencing outcome and that he would have been offered a sentence well short of mandatory life imprisonment.

With regard to timing, in order to give the State a chance to consider whether to appeal the issuance of this writ, the plea reoffer must be made by October 9, 2014, which is around two weeks longer than the thirty-day deadline to file a notice of appeal. If the State does decide to appeal, it may ask this Court to stay the writ until after the appeal's disposition.

ENTERED:


s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 27, 2014