ROBERT HUDSON,           )
           )
      Petitioner,     )    No. 13 C 00678
           )
  v.             )    Judge Edmond E. Chang
           )
KIM BUTLER, Warden,     )
           )
      Respondent.   )
           )

## MEMORANDUM OPINION AND ORDER

In 2013, Robert Hudson petitioned for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2005 convictions for armed robbery and unlawful restraint, which were upheld by the Illinois Appellate Court.[1] Hudson's sole claim was that he was denied effective assistance of counsel during plea negotiations. In August 2014, the Court granted Hudson's petition, concluding that even in light of the deferential standards of review, Hudson demonstrated that his lawyer was ineffective in failing to advise him that, if convicted of the charged offenses, Hudson faced a *mandatory* life sentence without the possibility of parole. Hudson also proved that he would have accepted the State's plea deal, instead of proceeding to trial, had he known about the mandatory life sentence. As a remedy, the Court required the State to reoffer Hudson's original plea deal of twenty years, and the offer had to be based on a charge that would not trigger mandatory life

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. §§ 2241, 2254. Citations to the docket are noted as "R.," followed by the docket entry.

imprisonment. The State did not appeal the grant of the writ. In February 2016, after numerous state-court proceedings were held in response to the grant of the writ, the Illinois Circuit Court held a hearing and rejected the new twenty-year plea deal offered by the State. Hudson now returns to federal court, seeking to enforce the August 2014 habeas decision by ordering Hudson's immediate release from the Illinois Department of Corrections. For the reasons explained below, this motion is denied, because Hudson must first pursue a state appeal of the Circuit Court's rejection of the twenty-year plea deal.

## I. Background

### A. Hudson's Habeas Petition

The only facts set out here on the underlying merits of Hudson's habeas petition are those needed to decide the pending motion; a fuller recitation of the facts is in the prior Opinion granting the petition. R. 45, 8/27/14 Opinion; *Hudson v. Harrington*, 2014 WL 4244255, at *1 (N.D. Ill. Aug. 27, 2014).

In 2005, a jury convicted Hudson of one count of armed robbery and three counts of unlawful restraint for holding up a truck stop at gunpoint. *Hudson*, 2014 WL 4244255, at *1-2. After trial, Hudson was sentenced to life imprisonment with no possibility of parole under the then-effective Illinois Habitual Criminal Act. *Id.* at *2 (citing 720 ILCS 5/33B-1). As found in the Opinion granting the writ, Alexander Beck, Hudson's court-appointed attorney, inaccurately told Hudson during plea negotiations that if he went to trial and was convicted, Hudson would receive an extended-term sentence of six to sixty years, with a likely sentence of

forty-four years (and eligibility for day-for-day credit). *Id.* In reality, Hudson faced a natural life sentence because of two prior class X armed robbery convictions in his criminal history. *Id.* at *2-3. But neither Beck, the prosecution, nor the state Circuit Court knew about the armed robbery convictions before trial. *Id.*; R. 82, St.'s Resp. at 13. Before plea negotiations began, Hudson completed an intake form at the Will County Public Defender's Office, stating that he had previously been convicted of unlawful possession, murder, and theft. *Hudson*, 2014 WL 4244255 at *1. Next to the word "alias," a Will County investigator wrote "Ø." *Id.* After this intake interview, Beck received a copy of Hudson's fingerprint-generated LEADS criminal-history record, the first page of which stated that Hudson had been convicted *six* times—three more times than Hudson noted on his intake form. *Id.* at *2. The first page of the LEADS printout also stated that some of this criminal activity was recorded under the "alias name" of "Hudson, Mark" and the "alias DOB" of November 11, 1957 (Hudson's actual birthdate is December 11, 1957). *Id.* This information was repeated on pages two, three, and twelve of the LEADS report. *Id.* Two of Hudson's prior thefts and a 1986 murder conviction were listed under his alias date of birth. *Id.* at *2; R. 16-9 at 76, LEADS Report at A-5, A-6, A-7. And one of those theft convictions was also listed under his alias name of Mark Hudson. *Id.*

The prosecution offered Hudson a succession of increasingly lenient pleas, starting at twenty years before trial and then culminating at sixteen years while the jury deliberated. *Hudson*, 2014 WL 4244255 at *2. But Hudson turned down the offers and chose to await a verdict, believing that he could receive a sentence as low

as six years, based on what his defense counsel had told him. *Id.* After Hudson was convicted, the trial court ordered a presentence investigation report (PSIR) in preparation for sentencing. *Id.* at *2. The Will County probation department reviewed Hudson's LEADs report—the same one that Beck had received—and realized that Hudson actually had two prior class X armed robbery convictions from his teenage years. *Id.* This meant that Hudson was actually subject to a mandatory natural-life sentence under the then-effective Illinois Habitual Criminal Act, 720 ILCS 5/33B-1. *Id.* After being sentenced to mandatory life without parole, Hudson raised a number of post-trial challenges in state court and, eventually, in a federal habeas petition. *Id.* at *2-4.

In August 2014, this Court held that the Illinois Appellate Court (which was the last state court to decide the merits of the question) had unreasonably found that Hudson was to blame for the incomplete criminal history; the Appellate Court concluded that Hudson revealed only those convictions connected to his real name and real date of birth, while purposefully omitting the convictions that were associated with an alias. *Id.* at *5. (The Court will refer to this August 2014 Opinion as the "habeas opinion.") In reality, the record evidence showed that Hudson had reported to the public-defender investigator the 1986 murder conviction, which was listed under his November 11, 1957 alias date of birth. *Id.* The LEADS criminal-history printout also showed that Hudson was convicted twice of theft, both of which were under his alias date of birth and one of which was under his alias name of Mark Hudson. *Id.* Thus, the Illinois Appellate Court unreasonably found that

Hudson's attorney had performed adequately, because defense counsel failed to give even a cursory review of Hudson's fingerprint-generated LEADS report. *Id.* at *5. A proper (or even superficial) review would have revealed Hudson's complete criminal history because the report stated in several places—including on the *first page*—Hudson's alias name and alias date of birth. *Id.* at *7. The LEADS report also clearly stated that the two prior armed robbery convictions were attributable to Hudson. *Id.* Recognizing this would have prevented defense counsel from giving the mistaken prediction about Hudson's sentence. *Id.* at *5-6. Finally, the Court determined that Hudson had been prejudiced by his attorney's defective performance: there was a reasonable probability that Hudson would have accepted the initial twenty-year plea had he known he was facing a mandatory life sentence, and there was also a reasonable probability that the state trial court would have accepted this plea. *Id.* at *8-9.

On the question of the appropriate remedy, the Court noted that this case presented the unusual situation where resentencing on the same charges would just lead back to a mandatory life term. *Id.* at *9. So rather than order a resentencing, the Court directed the State to reoffer its initial plea of twenty years, but based on a charge that did not trigger mandatory life, because that offer would "best place[] the parties at the beginning of the plea process." *Id.* (citation and quotation marks omitted). If Hudson accepted the offer, "the state trial court can then exercise its discretion in determining whether to vacate the convictions and resentence [Hudson] pursuant to the plea agreement, to vacate only some of the convictions

and resentence [Hudson] accordingly, or to leave the convictions and sentence from trial undisturbed." *Id.* (quotation marks omitted) (quoting *Lafler*, 132 S. Ct. 1376, 1391 (2012)). This remedy was drawn from *Lafler v. Cooper*, the prevailing Supreme Court authority on ineffective-assistance claims during plea bargaining. 132 S. Ct. at 1391.

The State then moved for reconsideration, which the Court denied in February 2015. R. 63, 2/14/15 Order; R. 64, 2/19/15 Corrected Order. The Court then required the State to reoffer the twenty-year plea by March 3, 2015 unless the State filed a motion to stay the reoffer requirement with the Seventh Circuit before then. 2/19/15 Corrected Order at 13. The State did not appeal or request a stay.

## B. Plea Reoffer Process

Consistent with the February 2015 Order, the State reoffered Hudson the twenty-year plea deal on March 3, 2015. R. 76-1 at 7, Pet.'s Exh. A, 3/3/15 SA to Hudson Letter. The new plea deal was based on one charge of attempted armed robbery, a Class 1 felony that would not trigger a mandatory life sentence, and included eligibility for day-to-day sentencing credit. *Id.* (The sentence also accounted for an extended term because of Hudson's criminal history; the twenty-year term fell within the extended-term range of fifteen to thirty years for a Class 1 felony. *Id.*) The next day, Hudson's attorney informed Assistant State's Attorney Colleen Griffin that Hudson accepted the State's deal, and confirmed that the parties would be filing an agreed motion under 735 ILCS 5/2-1401 to vacate the conviction and sentence. R. 76-1 at 9, Pet.'s Exh. B, 3/4/15 Hudson to SA Letter.

That Illinois statute provides "relief from final orders and judgments." 735 ILCS 5/2-1401(a). As planned, the State faxed to Hudson's counsel an "Agreed Motion to Vacate Convictions and Sentence, and to Resentence" signed by ASA Griffin. R. 76-1 at 12, Pet.'s Exh. C, 3/6/15 Draft Agreed Mot. to Vacate.

On March 20, 2015, the parties appeared in Will County Circuit Court before the judge who had presided over Hudson's original trial, sentencing, and post-conviction motions. R. 76-1 at 17, Pet.'s Exh. D, 3/20/15 Tr. Hudson's attorneys explained that this Court had granted Hudson's habeas petition, and that they were filing appearances to carry out the remedy outlined in the habeas opinion. *Id.* 2:1-3:11. But the state court asked, "Why don't they handle all that nice stuff up there?", *id.* 3:5-6, and then explained that it could not grant the appearance motions because it had no "jurisdiction" over the case, despite the granting of the writ:

> Well, at this point what I am looking at in my criminal record … is orders from the Appellate Court in Ottawa that suggested all issues addressed by this Court were correct, and I have nothing from the Federal Court that suggests otherwise. So you can file your appearance to do what? I mean, there is nothing here. I don't have jurisdiction. I don't have anything here.

*Id.* 3:12-19. Based on this perceived lack of jurisdiction, the state court denied the appearance motions. *Id.* 5:1-3 ("I'm telling you this. There is nothing here to file your appearance on. I have no jurisdiction over Mr. Hudson.").

On April 6, 2015, the state court held another hearing on the appearance motions. R. 76-1 at 23, Pet.'s Exh. E, 4/6/15 Tr. This time, the state court had a copy of the habeas opinion, *id.* 4:20-21, but asked: "Is it common for Federal judges to be

engaged in plea negotiations with defendants?", *id.* 5:5-6. It then suggested that the federal court itself should have somehow entered the relief:

> Please provide me should you choose to present some form of a plea agreement that's being negotiated by a Federal judge, please provide me sufficient case law so I know that a Federal judge can tell a State judge what to sentence someone to and how to do it on what kind of charges; and that he, I believe it's a male Federal judge, whatever he decides, he doesn't have to carry through with it because he believes somehow that it should come back here versus just handling it himself.

*Id.* 9:19-10:3. Furthermore, because Hudson's conviction triggered mandatory life, the state court believed that the State could not offer a twenty-year plea: "So, how do you give an offer, how does the State's Attorney or Miss Madigan give an offer that's illegal?" *Id.* 5:22-24. When Hudson's counsel responded that Hudson's current conviction would be vacated, and that Hudson would plead to an offense that would allow for a twenty-year sentence, the state court again suggested that the federal court should just enter the remedy: "But he was convicted by a jury. … So he wishes to plead guilty to some other offense that he was not convicted of? … . Why don't they do that in Federal Court? Why are they burdening us?" *Id.* 6:5-12. The state court eventually agreed that "[i]f, however, [Will County State's Attorney] Glasgow chooses to change a charge for somebody … and your client wishes to plead guilty to a charge, whatever that means, then it appears to me like every other case I have, there will be a proposed disposition." *Id.* 8:14-18. The state court then asked about the appropriate protocol: "[W]hat you want me to do is have a writ to have Mr. Hudson presented here for some proposed plea agreement. If the Court rejects it, then the State doesn't vacate the conviction and everything that was done

previously stands; is that correct?" *Id.* 10:12-16. Both parties agreed, *id.* 10:17-20, and chose a return date of May 11 to present the plea agreement, *id.* 10:21-13:7. But the court did warn: "I must admonish you during the course of that proposed disposition or plea, that I am never bound by a plea agreement. In State court, judges are not rubber stamps. And you must talk to your client and tell him the judge in Federal court wants you to have 20 years. There is nothing to suggest that that's what I will do, and I don't know if I will or won't." *Id.* 8:19-9:3.

Around a week later, Hudson's attorneys emailed ASA Griffin to finalize the language in the agreed motion to vacate. R. 76-1 at 38, Pet.'s Exh. F, 2015 Attorney Emails. But ASA Griffin withdrew her agreement to the motion, stating: "At this point I want to wait until we get in front of the judge. Given her apparent indication that she would not go along with any agreed resentencing, or reduction of charges, I am not in a position to file a motion to vacate the conviction, as that might bind me to vacating the conviction, and having no choice left but to retry the defendant." *Id.* at 2 (4/15/15 email from ASA Griffin to attorney From). She also explained: "I believe I have complied with the federal judge's order, in making the offer, but if the judge won't accept the proposed agreement, I don't want to have defendant's conviction vacated, obviously[.]" *Id.* ASA Griffin appeared to be basing this decision on the state court's statements at the two prior hearings, and also on a conversation from a few days earlier, when Griffin "asked [the state judge] about the background of the case" while dropping off a courtesy copy of the agreed motion to vacate. R. 76-1 at 96, Pet.'s Exh. L, Griffin Aff. ¶ 6. During this conversation, the state judge had

expressed that Hudson had "lied" or "misrepresented" his criminal background and that she "would not" or "might not" accept the plea deal. *Compare* R. 76-1 at 74, Pet.'s Exh. I, Carroll Aff. ¶ 5, *with* Griffin Aff. ¶¶ 6-7. Griffin relayed this conversation to Hudson's counsel, who remembers that Griffin also said that the state judge had said that Hudson's trial counsel was not ineffective and that it would be illegal for her to agree to the twenty-year plea. Carroll Aff. ¶ 5. So because the "[circuit court judge] informed [Griffin] that she might not go along with said [plea] agreement," Griffin became worried that Hudson would be left with no sentence and no conviction in place if the state court rejected the plea deal after Hudson's convictions were vacated. Griffin Aff. ¶¶ 8-9. In that situation, the State was also concerned that "[Hudson] might seek to proceed to a second trial and gamble again for an acquittal." St.'s Resp. at 19. But Hudson's attorneys believed that withdrawing the agreement for the motion to vacate violated both the reoffered plea deal—which acknowledged a joint motion to vacate Hudson's sentence—and also the habeas opinion. 2015 Attorney Emails at 1 (6/26/15 email from attorney From to ASA Griffin stating that "[t]he State's current opposition to vacating defendant's conviction and sentence effectively retracts its prior commitment to re-offer the 20-year plea deal, and cannot be squared with [the federal court's] habeas order").

In light of the State's new opposition, on May 4, Hudson filed (an opposed) "petition to vacate convictions and sentence, and to resentence" under 735 ILCS 5/2-1401 that was substantially similar to the prior agreed version. R. 76-1 at 42,

Pet.'s Exh. G, Def.'s 5/4/15 Mot. to Vacate. In response, the State moved to dismiss Hudson's motion for relief. R. 76-1 at 76, Pet.'s Exh. J, St.'s 6/22/15 Mot. to Dismiss. Hudson also filed a motion for substitution, arguing that the assigned state judge had stated her unwillingness to provide any relief for Hudson. R. 76-1 at 54, Pet.'s Exh. H, Def.'s 5/4/15 Mot. for Substitution. A different state judge denied that substitution motion. R. 82-6, St.'s Exh. 6, 9/10/15 Tr.

On December 21, the parties argued the State's dismissal motion in front of the original state judge. R. 76-2 at 241, Pet.'s Exh. S, 12/21/15 Tr. The State first argued that Hudson's motion was untimely because Section 2-1401 petitions must be made within two years of the sentence. *Id.* 3:21-4:8. The State further argued that Hudson failed to state a cause of action because, although Section 2-1401 may be used to challenge a void judgment, a federal court's ineffective-assistance finding does not make the underlying conviction void. *Id.* 4:9-6:15. According to the State, this was supported by *Lafler*, which permitted the state trial court to exercise its discretion to accept or deny the reoffered plea agreement. *Id.* 7:10-8:11. Hudson, on the other hand, emphasized that *Lafler* required the state to provide some procedural vehicle to redress a constitutional violation and to reconsider a reoffered plea agreement, and that Section 2-1401 should be used to serve that purpose because Hudson's convictions were constitutionally void. *Id.* 9:5-12:4. Hudson also believed that the State had waived the statute of limitations by offering the new plea agreement and by previously agreeing to the motion to vacate. *Id.* 8:15-9:4. After hearing the arguments, the state court expressed a concern: "This is brought

to actually vacate the conviction … then at some point in the future we will have a hearing whether or not the Court does accept a proposed [plea] disposition. In the meantime how does the Department of Corrections continue to hold somebody in their care when there is no conviction or sentence? They can't. They simply cannot." *Id.* 14:8-17. The state court also "couldn't find anything … where [the federal court] is suggesting that [it] can dictate disposition on a matter that doesn't give the defendant means in which to do it practically speaking[.]" *Id.* 15:3-8. Then the state court agreed with the State that Hudson's motion to vacate was both untimely and also "an improper means in which to present a proposed disposition." *Id.* 15:11-20. After the dismissal, both parties asked, and the state court agreed, to return on December 29 for a hearing on Hudson's proposed plea agreement. *Id.* 18:15-23.

### C. State Court's Consideration of Reoffered Plea

When the parties next returned on December 29, ASA Griffin explained that "we are here today to present a proposed plea agreement" pursuant to the habeas opinion. R. 76-2 at 262, Pet.'s Exh. T, 12/29/15 Tr. 2:23-3:5. Griffin then explained: "If your Honor would be prepared to go along with the agreement, the State would be prepared to file a new information in the case alleging attempt[ed] armed robbery as a class one felony; because of the defendant's previous criminal history, he would be extended term eligible which would be 15 to 30 years, so a 20-year offer would be acceptable under the new information," *id.* 3:8-15, "[a]nd of course if your Honor was to go along with this plea agreement, the State would be prepared to vacate the previously entered conviction," *id.* 4:18-20. When the state court asked

about the appropriate protocol for evaluating the plea deal, Hudson's counsel responded that "[t]here is no protocol. We believe that determining the protocol would be within this Court's jurisdiction." *Id.* 4:24-5:2. The state court then explained that it "cannot pre-judge and decide whether or not a plea agreement is acceptable … until there is some charge before [it] … and some factual basis and some admission of guilt by a defendant[.]" *Id.* 5:3-7. To consider the plea, the state court needed an affidavit from Hudson's attorneys stating that they had communicated with Hudson about the plea, a report of Hudson's prior criminal history, an updated PSIR from the Will County probation office, and an affidavit from Hudson admitting guilt. *Id.* 5:8-18, 8:21-9:1.

As for Hudson's affidavit, the state court required Hudson to accept responsibility not for the underlying crime of attempted armed robbery, but rather for his role in the events leading up to Beck's ineffective assistance; that is, Hudson must admit "that any true defect in the representation of counsel is probably more likely the conduct of Mr. Hudson as opposed to the trial attorneys that I had in front of me for the last 15 years[.]" *Id.* 5:14-18. The state court added that "though Mr. Hudson has been very successful in the Federal level … it's now time for him to be more honest with this Court regarding his own abilities to reflect that Mr. Beck and Mr. Lenard[2] were, in fact, not deficient but [that Hudson] did everything he could in order to hide his prior criminal history so that he turned down not just a 20-year offer … he [also turned down] offers less than that." *Id.* 6:18-23; *see also id.* 7:15-20

---

[2]The state court had also appointed attorney George Lenard to assist Beck with the original trial. *See* R. 4 at 4.

("I need to have something to suggest that, in fact, [Hudson] has been able to convince other people that he was somehow wronged; but if he wants 20 years from me, then he is going to admit that his communication with Mr. Beck and Mr. Lenard was less than complete, so that they could, in fact, properly represent him."); *id.* 10:12-18 ("[B]ased on [Hudson's] ability to suggest to the Federal Court that [his conviction] is somehow not fair, that you are asking this Court in its own leniency and protocol to accept a disposition for 20 years," the state court needs "an affidavit from Mr. Hudson that his communication with Mr. Beck and Mr. Lenard was less than he should have done in order for them to properly represent him."). Despite Hudson's arguments that the "factual assertion [of Hudson's role in the ineffective assistance] is not properly before this Court," *id.* 10:21-22, the state court stated: "There is no reason for me not to have affidavits by counsel and Mr. Hudson is what I am indicating to you. If you are choosing not to give that to me under the protocol that I can suggest, then you are suggesting that Mr. Hudson wants to go back to Federal Court and say that the protocol that I am suggesting is not fair. You do that. I don't care," *id.* 9:4-11. The state court also emphasized "the integrity of [Hudson's] trial lawyers," *id.* 7:11, and that it had personally appointed attorney Beck "to make sure that everything could have been right and corrected for [Hudson] ten years ago," *id.* 7:5-6. A few months later, Hudson filed the requested affidavits. R. 76-2 at 283, Pet.'s Exh. U, Def.'s 2/17/15 Mot. to File Affs.

On February 23, 2016, the parties returned to state court—this time, to finally address the merits of the reoffered plea deal now that the affidavits and

14

PSIR were complete. Once again, the state court questioned its jurisdiction to proceed, asking: "Do you have something that indicates that I have jurisdiction to do this? … How do I get the jurisdiction? Because the federal court says so? Gentlemen, do you have something for me that says how I get jurisdiction in this case?" R. 76-2 at 320, Pet.'s Exh. V, 2/23/16 Tr. 5:8-9, 5:19-22; *see also id.* 6:10-11 ("Where do I get the ability to do this?"); *id.* 6:20-22 ("Do you have a copy of the federal district court order that is ordering me to do something?"); *id.* 7:3-11 ("And the federal court has the jurisdiction to order the State to make a plea agreement? … . Then the federal court also has the jurisdiction or the right to tell a trial court to do something like consider it?"). In response, Hudson again pointed out *Lafler*, the federal-court habeas process, and the habeas opinion. *Id.* 5:23-7:1. Before going through the plea agreement, the state court asked the parties what would happen if it decided to reject the plea: "If I suggest that the proposed disposition … with the nature of the prior criminal history here, it's not something I ordinarily would otherwise concur in, so therefore I am not a rubber stamp, if in fact we have our hearing and we determine that, what happens next?" *Id.* 8:5-11; *see also id.* 7:17-19 ("If I find that it is not within my range of things that I normally do, then what happens?"); *id.* 8:2-3 ("Let's just say if I don't [agree], then what happens?"). Hudson's counsel responded that the circuit court should consider how to best remedy the constitutional violation, and that "[i]f you were to consider those factors and you were to decide to not issue the remedy that Mr. Hudson has requested, then we would go back to the federal district court which we believed retained

jurisdiction over this matter to make sure that its order was complied with." *Id.* 8:12-24.

The state court then proceeded to consider the twenty-year plea deal, first pointing to Hudson's criminal history—and in particular, the prior murder conviction. *Id.* 10:8-13. It noted that "Hudson … discharged four rounds into the victim in that case," *id.* 11:8-9, and that it was "most striking and very interesting that on May 1st of '84 through February 5th of '86 [Hudson] [was] incarcerated … . The date of the murder is March 27th. So he is not out of custody of DOC for even two months when he commits a murder," *id.* 14:7-12. The state court then explained that Hudson had been continuously incarcerated since 1979 and that his offenses were often violent and involved deadly weapons. *Id.* 14:12-15:6. The state court also recapped facts of Hudson's 2005 armed robbery conviction that came out at trial: Hudson had fled in a car with "money [] sticking out of his pockets," used a handgun, duct taped three people, and committed the crime for revenge. *Id.* 15:7-16:4. The conclusion was that Hudson's extensive criminal history warranted a life sentence, because he "had so many shots of living within the community and has lost his opportunity to do so." *Id.* 16:5-9.

The life sentence, in the state court's view, was also supported because "police, jurors, appellate courts, court-appointed counsel [all] ma[de] sure that Mr. Hudson's rights were protected." *Id.* 17:1-4. In particular, Hudson's court-appointed trial attorneys were "two of the finest trial lawyers in Will County and anyplace," and Nash, Hudson's court-appointed post-conviction attorney "[was] incredibly

thorough and incredibly ethical and he tried his best years ago to" resolve the ineffective-assistance issue. *Id.* 17:4-12. Then, the state appellate process gave "every opportunity for Mr. Hudson to have a much more precise review of the record … and people have [spent] a lot of time in considering what is right and what is wrong. Everything that was afforded to Mr. Hudson on the trial level here was completely affirmed." *Id.* 17:12-19. The state court went on to say that Hudson was to blame for defense counsel not knowing about the full criminal history:

> The only person who did anything wrong here in the process of protecting Mr. Hudson as [to] protecting his constitutional rights … is Mr. Hudson. He did not afford himself the opportunity to be forthwith with his attorneys on whatever level that was, and based upon that he spent some time in the Department of Corrections to get to federal court. There has been nothing ever presented to me yet to suggest that as a trial judge I should somehow wipe away what a jury did years ago and wipe away a criminal history that we can pretend doesn't exist or suggest that knowing the parties that were involved here, presiding over the trial, doing the hearings to determine if in fact Mr. Beck or Mr. Lenard fell below appropriate standards, because if you thought that everyone was just going to rubber stamp it just because he says it [] must not be true, that's not what happened.

*Id.* 17:19-18:14. After making those findings, the state court then addressed the proposed plea, explaining that she would have rejected it even if she was considering this deal for the first time, after factoring in Hudson's criminal history, the pleadings, affidavits, PSIR, and the rest of the record. *Id.* 19:10-20:13. The state court added that she would not approve Hudson's new plea "just because some federal judge thinks I should … ." *Id.* 19:22-23; *see also id.* 19:1-5 ("I am not going to do it. I am not going to wipe away what a jury did. I am not going to wipe away every safety and checks that were given to Mr. Hudson along the way and say

because, just because. I don't do it."). When Hudson's counsel asked to clarify whether the state court was rejecting the plea on its belief that Hudson's counsel was not ineffective, the court responded: "I have already made that finding. I have already made that finding years ago[,]" and "there was nothing I can determine based on what I know on my findings, on our appellate record findings to change it, [and] that is not getting changed in front of me." *Id.* 20:4-11, 20:22.

### D. Motion to Enforce Writ

After the state court's February 2016 rejection of the plea, Hudson filed a motion for reconsideration, which was denied. R. 76-2 at 344, Pet.'s Exh. W, Def.'s 3/23/16 Mot. to Reconsider. Hudson also filed a timely notice of appeal. R. 76-2 at 350, Pet.'s Exh. X, Def.'s 3/23/16 Notice of Appeal. Hudson now asks this Court to order Hudson's immediate release, arguing that both the State's Attorney's Office and the state court failed to comply with the habeas opinion and the Supreme Court's *Lafler* decision, and that a state appeal cannot provide timely and full relief. R. 70, Pet.'s Mot. to Enforce.

### II. Analysis

A discussion of *Lafler v. Cooper* is necessary to set the stage for the Court's analysis of the motion to enforce. In *Lafler*, the Supreme Court extended the Sixth Amendment right to effective counsel to the plea-bargaining stage. 132 S. Ct. at 1386. When counsel performs deficiently at this stage, a criminal defendant can suffer two forms of prejudice. *Id.* at 1389. One form arises where the defendant had been offered a lesser sentence on a charge (or set of charges), rejected the plea offer

on constitutionally deficient advice, and then was convicted on the *same* charge (or the same set of charges). *Id.* To remedy that situation, the habeas court may order resentencing, and the "[state trial] court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between." *Id.*

But the Supreme Court also recognized (presciently, in light of this case) that another form of prejudice might arise. Specifically, "resentencing alone will not be full redress for the constitutional injury" in cases where "an offer was for a guilty plea to a count or counts less serious than the ones for which a defendant was convicted after trial, or if a *mandatory sentence* confines a judge's sentencing discretion after trial." *Id.* (emphasis added). The mandatory-sentence problem is the problem Hudson faces here: resentencing on the armed robbery, a Class X felony, would require the state trial court to once again impose a mandatory life sentence. So some other relief is required to remedy the constitutional violation. *Lafler* explained that reoffering a plea to a lesser charge that did not trigger the mandatory sentence might be necessary: "[i]n these circumstances, the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal. Once this has occurred, the [trial] judge can then exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed." *Id.*

The Supreme Court avoided setting a bright-line rule for trial judges in deciding whether to accept the reoffered plea; instead, "the trial court must weigh

various factors." *Id.* But because *Lafler* was the Supreme Court's first discussion of this remedy, the Court declined to delineate "the boundaries of proper discretion." *Id.* Rather, "[p]rinciples elaborated over time in decisions of state and federal courts, and in statutes and rules, will serve to give more complete guidance as to the factors that should bear upon the exercise of the judge's discretion." *Id. Lafler* did, however, offer two potential considerations: one is "a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions." *Id.* Second, the trial court may consider "any information concerning the crime that was discovered after the plea offer was made." *Id.* Although the Supreme Court recognized that it would be difficult to restore the parties to their pre-plea-rejection positions, that position was still the "baseline" for figuring out the remedy. *Id.* (although "[t]he time continuum makes it difficult to restore the defendant and the prosecution to the precise positions they occupied prior to the rejection of the plea offer … [,] that baseline can be consulted in finding a remedy that does not require the prosecution to incur the expense of conducting a new trial.") In other words, there are several competing interests: on the one hand, the petitioner has suffered a constitutional injury and must be restored, as closely as possible, to the position before rejecting a plea offer as a result of ineffective assistance. *Id.* On the other hand, the remedy shall "not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution." *Id.* at 1388-89 (citation omitted).

In this case, the crux of the parties' dispute is whether the state court properly exercised its discretion in a manner consistent with *Lafler* when rejecting the State's reoffered twenty-year deal. In Hudson's view, the state court's decision was impermissibly based on its disagreement with both *Lafler* and this Court's finding of ineffective assistance. *See generally* R. 77, Pet.'s Corrected Br. The State, for its part, argues that the state court properly relied on Hudson's criminal background, including his "overall history of violent and other felonies," "the details of his prior murder," "the details of his most recent crime," and "the shortness of time between each release from state custody and petitioner's next arrest." R. 82, St.'s Resp. at 14. Indeed, the state court explained that it "looked hard" at the case, "challenge[d] [itself]" to view the case without hindsight, and "reviewed every single" document. *Id.* at 14 (citing 2/23/16 Tr. 19-20). According to the State, the state court's apparent and stated disagreement with the writ's issuance was not predicated on an "anti-federal bias," but rather exemplified the complexity of judicial decision-making. *Id.* at 16. In other words, "judges regularly think two competing thoughts at once" and may simultaneously express personal disagreements with the merits of a decision while dutifully carrying it out. *Id.*

Hudson's motion thus presents two questions. The first: what is the appropriate procedure when a habeas petitioner argues that a state trial court has exceeded its discretionary bounds under *Lafler* or failed to carry out a *Lafler* remedy ordered by a federal habeas court? And second, under *Lafler*, what are the boundaries of a state trial court's discretion in implementing the new sentence or

considering the reoffered plea? Put another way, in what circumstances may a trial court reject a reoffered plea agreement, such that a habeas petitioner is effectively left with no remedy for a constitutional violation?

As explained below, the Court concludes that unless there is an outright refusal either by the state prosecutor to reoffer the plea deal or by the state trial court to consider that reoffered plea, a petitioner who believes that the state trial court erred in rejecting a reoffered plea must first appeal the decision in the state-court system. *Lafler* placed heavy emphasis on state trial court discretion in considering reoffered pleas (or picking new sentences), which makes sense because it is state courts (and state appellate courts) that are most familiar with the exercise of discretion in state criminal cases. Federalism interests also weigh in favor of requiring that the review of a rejected plea go through the state appellate system first. So here, it would be the Illinois Appellate Court that would decide whether the state trial court operated within the bounds of discretion in rejecting the plea offer, just as it would in the original prosecution. If the petitioner still does not obtain the requested relief at the end of the state appellate process, then he would file another habeas petition with the federal court.

## A. Determining the Proper Procedure

The caselaw is thin, to say the least, as to the proper procedure to follow where a petitioner claims that a state trial court has failed to implement a constitutional remedy for a *Lafler* ineffective-assistance claim. One conceivable route would be for the federal habeas court to directly review the state trial court's

decision and decide whether the state court abused its discretion in rejecting the plea. If the state court did commit an abuse of discretion, then the next step would depend on the nature of the error: either the federal court would order the trial court to consider it again (after correcting the error) or directly order the trial court to accept it, if the record shows that there is no reasonable basis to reject the plea. The other conceivable route is to require the petitioner to appeal the state trial court's decision through the state-court system, just as a criminal defendant would normally raise the issue on appeal after a prosecution. As explained below, the Court concludes that the Supreme Court would deem the second route as the correct procedure. The Illinois Appellate Court should have the initial opportunity to define *Lafler*'s discretionary boundaries, and to determine whether the state court properly stayed within them in Hudson's case. An exception to pursuing state appellate relief would apply if the state trial court outright rejected the habeas remedy and refused to consider the reoffered plea at all, whether because of disagreement with *Lafler*, the finding of ineffective assistance, or for some other reason. But absent an outright rejection by the state trial court, requiring a state-court appeal makes sense for reasons of efficiency, comity, and federalism.

## 1. Alleged Outright Refusal to Comply

The Court must first determine whether the state trial court expressed a wholesale refusal to consider the reoffered plea. If that was the case, then there has been no assessment of the plea deal at all, so the appropriate procedure would be to require the State to reoffer the twenty-year plea once again, and to require the trial

court to consider this plea, because that was the remedy ordered by the grant of the writ. In other words, the Court would not be so much reviewing the state court's exercise of discretion, but its refusal to implement the order that this Court entered—and that would not only be within this Court's jurisdiction to enforce, but it would make sense for the issuing court to decide whether there was an outright refusal to comply with the order.

In this case, there was almost—but not quite—an outright rejection of *Lafler* and the habeas opinion. On the one hand, the state court's lack of acknowledgement of *Lafler* and disagreement with the habeas opinion, as well as its continued skepticism of its "jurisdiction" (despite *Lafler*'s holding) could all be perceived as a refusal to implement the habeas remedy. After this Court issued the August 2014 habeas opinion, the parties appeared before the state court five times over the course of almost a year to present the reoffered plea deal. At the very first hearing in March 2015, Hudson explained that a federal district court had granted Hudson's habeas petition for ineffective assistance, and that "the State [now] has to craft an appropriate remedy that remedies the constitutional violation." 3/20/15 Tr. 2:22-3:11. Despite the issuance of the writ, the state court doubted its ability to act. The state court asked, "Why don't they handle all that nice stuff up there [in federal court]? … I mean, there is nothing here. I don't have jurisdiction. I don't have anything here." *Id.* 3:5-19; *see also id.* 4:9-10 ("Please give me some direction how I have any authority whatsoever as to this case?"); *id.* 5:1-9 ("I'm telling you this. There is nothing here to file your appearance on. I have no jurisdiction over Mr.

Hudson. And any time in the past over the last 15 years that I have been doing this, I have always been told unless there is something here, some jurisdiction, some mandate, something, some time frame even, then I have no right to allow anybody to do anything for Mr. Hudson. And, in fact, he is not even here suggesting to me that he wants this to be done. So you can understand my concerns.").

At the second hearing in April, the state court confirmed that she had a copy of the habeas opinion, 4/6/15 Tr. 2:14-18, 4:12-21, and Hudson's attorneys explained that the remedy outlined in the habeas opinion was supported by Supreme Court precedent, *id.* 9:8-16. Yet despite being on notice of *Lafler*, the state court doubted its ability to consider another plea and said that the federal court ought to just enter the relief: "[P]lease provide me sufficient case law so I know that a Federal judge can tell a State judge what to sentence someone to and how to do it on what kind of charges; and that he, I believe it's a male Federal judge, whatever he decides, he doesn't have to carry through with it because he believes somehow it should come back here versus just handling it himself." *Id.* 9:19-20:3; *see also id.* 5:22-24 ("[H]ow does the State's Attorney or Miss Madigan give an offer that's illegal?"); *id.* 6:11-12 ("Why don't they do that in Federal Court? Why are they burdening us?"); *id.* 7:24-8:2 ("I don't know if they can order the State to charge him on a charge that – does a Federal judge tell the State's Attorney what charges to proceed on as well?"). In December, the state court repeated these reservations during the hearing on the State's motion to dismiss, despite both parties' discussion of *Lafler* and the habeas opinion: "I was looking at everything that you gave me and

I couldn't find anything in there where [the federal court] is suggesting that [it] can dictate disposition on a matter that doesn't give the defendant means in which to do it practically speaking, because practically is what we do here every day. [Federal courts] don't necessarily have to have those concerns." 12/21/15 Tr. 15:4-10.

Even at the final February 2016 hearing, the purpose of which was to finally evaluate the twenty-year plea, the state court again asked about jurisdiction to consider the plea despite becoming aware of *Lafler* and the habeas opinion eleven months earlier: "Do you have something that indicates that I have jurisdiction to do this?" 2/23/16 Tr. 5:8-9; *see also id.* 5:19-22 ("How do I get the jurisdiction? Because the federal court says so? Gentlemen, do you have something for me that says how I get jurisdiction in this case?"); *id.* 6:10-11 ("Where do I get the ability to do this?"); *id.* 6:20-22 ("Do you have a copy of the federal district court order that is ordering me to do something?"); *id.* 7:3-5 ("And the federal court has the jurisdiction to order the State to make a plea agreement?"); *id.* 7:9-11 ("Then the federal court also has the jurisdiction or the right to tell a trial court to do something like consider it?").

What's more, throughout the course of the year, the state court also reiterated its prior finding that Hudson's counsel was constitutionally adequate and demanded that Hudson admit he was to blame: "[T]hough Mr. Hudson has been very successful in the Federal level … it's now time for him to be more honest with this Court regarding his own abilities to reflect that Mr. Beck and Mr. Lenard were, in fact, not deficient but [Hudson] did everything he could in order to hide his prior criminal history so that he turned down not just a 20-year offer … he [also turned

down] offers less than that." 12/29/15 Tr. 6:17-24; *see also* 2/23/16 Tr. 17:12-17 ("The appellate process went through the state court and every opportunity for Mr. Hudson to have a much more precise review of the record, appellate review, and people have a lot of time in considering what is right and what is wrong."). Indeed, despite the habeas opinion's finding of ineffective assistance, the state court would only consider the reoffered plea if Hudson filed an affidavit admitting that *he* was responsible for "any true defect in the representation of counsel … as opposed to the trial attorneys that I had in front of me for the last 15 years[.]" 12/29/15 Tr. 5:14-18; *see also id.* 7:15-20 ("I need to have something to suggest that, in fact, he has been able to convince other people that he was somehow wronged; but if he wants 20 years from me, then he is going to admit that his communication with Mr. Beck and Mr. Lenard was less than complete, so that they could, in fact, properly represent him."); *id.* 10:12-18 ("[B]ased on [Hudson's] ability to suggest to the Federal Court that [his conviction] is somehow not fair, that you are asking this Court in its own leniency and protocol to accept a disposition for 20 years," the circuit court needs "an affidavit from Mr. Hudson that his communication with Mr. Beck and Mr. Lenard was less than he should have done in order for them to properly represent him."); *id.* 9:4-11 ("There is no reason for me not to have affidavits by counsel and Mr. Hudson is what I am indicating to you. If you are choosing not to give that to me under the protocol that I can suggest, then you are suggesting that Mr. Hudson wants to go back to Federal Court and say that the protocol that I am suggesting is not fair. You do that. I don't care."). In resisting the need to file an affidavit in

which Hudson would take the fall for the ineffective assistance, Hudson argued that the "factual assertion [of his role in the ineffective assistance] is not properly before this Court." *Id*. 10:21-22. The state court's response made it clear that taking the blame was a condition of consideration of the plea: "You come back on a plea without this followed, then you're going someplace else." *Id*. 11:7-8.

On top of all this, the state court repeatedly underscored the integrity of Hudson's counsel, in essence concluding that counsel had not been ineffective. *See* 12/29/15 Tr. 7:3-8 ("And you also know that the attorney that was appointed to represent him, that I appointed to represent him to make sure that everything could have been right and corrected for him ten years ago[.]"); 2/23/16 Tr. 17:4-12 ("The counsel I appointed to [Hudson] after having Mr. Lenard and Mr. Beck represent him, two of the finest trial lawyers in Will County and anyplace, a gentleman by the name of Mr. Raymond Nash, who is now one of the judges here in Will County, because he is incredibly thorough and incredibly ethical and he tried his best years ago to have a matter resolved for Mr. Hudson … ."). The state court summed up its disagreement with the ineffective-assistance finding:

> The only person who did anything wrong here in the process of protecting Mr. Hudson as protecting his constitutional rights … is Mr. Hudson. He did not afford himself the opportunity to be forthwith with his attorneys on whatever level that was, and based upon that he spent some time in the Department of Corrections to get to federal court. There has been nothing ever presented to me yet to suggest that as a trial judge I should somehow wipe away what a jury did years ago and wipe away a criminal history that we can pretend doesn't exist or suggest that knowing the parties that were involved here, presiding over the trial, doing the hearings to determine if in fact Mr. Beck or Mr. Lenard fell below appropriate standards, because if you thought

that everyone was just going to rubber stamp it just because he says it [] must not be true, that's not what happened.

*Id.* 17:19-18:14.

Despite all of this evidence of resistance to the habeas opinion, however, the Court cannot conclude that the state court outright refused to consider *Lafler* or the State's twenty-year reoffered plea. Ultimately, the state court did set out a process for hearing the new plea. At the April 2015 hearing, the state court said: "If … Mr. Glasgow chooses to change a charge for somebody … and your client wishes to plead guilty to a charge, whatever that means, then it appears to me like every other case I have, there will be a proposed disposition." 4/6/15 Tr. 8:14-18. In a later hearing, the state court explained that it would consider the new plea agreement along with Hudson's prior criminal history, an updated PSIR, and affidavits from Hudson and his attorneys. 12/29/15 Tr. 6:9-24. And the state court scheduled the February 2016 hearing for the specific purpose (at least in part) of evaluating the reoffered plea. *See* 2/23/16 Tr. So because the state court took steps to evaluate the new twenty-year plea, the Court cannot hold that there was a blanket refusal to consider Hudson's remedy.[3]

Finally, Hudson argues that the State's Attorney's Office also failed to comply with the habeas opinion by withdrawing its agreed motion to vacate Hudson's conviction, moving to dismiss Hudson's motion to vacate, and failing to advocate to

---

[3]To be clear, however, the Court is *not* concluding that the state court actually complied with *Lafler* or stayed within the acceptable boundaries of discretion in deciding to reject the twenty-year plea. As the Court will explain in the next section, the Illinois Appellate Court should have the first opportunity to define the appropriate boundaries of discretion and to assess whether the state court stayed within them.

the state court for the acceptance of the plea. Pet.'s Corrected Br. at 23-25. But the State also did not outright refuse to follow the habeas opinion. The State argues that after learning of the state court's hesitation about the new twenty-year plea, it became concerned that the state court would reject the plea deal, and then no conviction would be in place if the motion to dismiss the original convictions had already been granted. St.'s Resp. at 19. In that case, there would be the practical concern of "how … the Department of Corrections [would] continue to hold somebody in their care when there is no conviction or sentence," 12/21/15 Tr. 14:14-16, along with the added worry that "petitioner might seek to proceed to a second trial and gamble again for an acquittal," St.'s Br. at 19. These are legitimate concerns. And despite moving to dismiss Hudson's motion to vacate the conviction, the State continued to move forward with presenting the twenty-year deal to the state court for consideration. *E.g.*, 4/6/15 Tr. 10:4-18 (State agreeing that the "protocol" was to present the twenty-year plea to the state court); 12/21/15 Tr. 18:15-18 (asking the state court, after Hudson's motion to vacate was dismissed, to return "for presentation of a proposed plea agreement"); 12/29/15 Tr. 3:8-15, 4:18-20 (explaining that if the state court accepted the new twenty-year plea, the State would vacate Hudson's original conviction); 2/23/16 Tr. 7:3-16 (agreeing that the federal court may order the State to offer a new plea agreement, which the trial court must consider). At no point did the State refuse to offer the twenty-year agreement, retract it, or argue that it should be rejected. To be sure, the State did not actively defend the new plea agreement in front of the state court, and its

advocacy for the plea can hardly be described as enthusiastic. It is also doubtful that if this was an ordinary case, the State—facing the possibility of trial if its plea agreement was rejected—would be so nonchalant in its defense of the agreement. But because the State did reoffer the twenty-year plea and helped to present it to the trial court for consideration, the Court cannot hold that the State outright refused to comply with the habeas opinion.

## 2. State-Court Appeal

Because the state trial court (and the State's Attorney's office) did not outright refuse to comply with the order granting the writ, the Illinois Appellate Court should have the first opportunity to both define *Lafler's* discretionary factors in deciding how to resentence or treat a reoffered plea, and to determine whether the state trial court operated within the bounds of fair discretion in this case. As explained next, although there is little guidance to the proper procedural course in this unusual situation, *Lafler* emphasized the role of the state-court system in implementing a remedy. State appellate courts will have more experience and expertise in reviewing the exercise of discretion, and principles of federalism counsel in favor of the state-appellate route.

First, in discussing how state trial courts would consider a reoffered plea, *Lafler* itself suggested that state rules of decision and procedures would apply—at least as much as possible. *Lafler*, which was in the same procedural posture as this case (a § 2254 habeas action challenging a state-court conviction), rejected the federal district court's direct order of specific performance of the original plea

agreement, and instead put the plea-acceptance decision in the state trial court's hands. 132 S. Ct. at 1391. In doing so, the Supreme Court cited to a Michigan Supreme Court rule governing the state courts' plea-acceptance process. 132 S. Ct. at 1391 (citing Mich. Sup. Ct. R. 6.302(C)(3) ("If there is a plea agreement and its terms provide for the defendant's plea to be made in exchange for a specific sentence disposition or a prosecutorial sentence recommendation, the court may ... reject the agreement … [,] accept the agreement" with or without considering a PSIR, or "take the plea agreement under advisement.")). *Lafler* thus recognized that state practices and rules govern, to the extent possible, the state court's exercise of discretion.

Putting this decision in state-court hands makes sense because state courts have more experience in evaluating the propriety of state plea deals and state criminal sentences. Here, the Illinois Appellate Court will be better equipped, in the first instance, to consider and to craft discretionary factors that are in line with *both* state law and *Lafler*, as well as assess the state court's decision in Hudson's case. For example, the Illinois Appellate Court is better positioned to know whether it is unusual—or instead ordinary or somewhere in between—for state trial courts to reject an agreed-on plea, what factors trial courts commonly rely on in making this decision, or whether a state court violated state laws governing pleas. In Hudson's case, by rejecting the new plea agreement, the state court was effectively saying that during the initial prosecution, it would not have accepted anything short of mandatory life without parole, even if Hudson wanted to plead guilty to a lesser charge and the State offered it. Whether that was a proper exercise of discretion is

something the Illinois Appellate Court can consider as it ordinarily would in a direct appeal.[4]

Appealing through the state courts first is also consistent with the principles underlying the *Rooker-Feldman* doctrine, which provides that "lower federal courts do not have subject matter jurisdiction over claims seeking review of state court judgments." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923); *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983)). This doctrine prevents a party who has lost in state court from seeking federal-court review of either that proceeding, or of other "claims that are inextricably intertwined with claims reviewed by the state court." *Leaf v. Supreme Court of State of Wis.*, 979 F.2d 589, 598 (7th Cir. 1992) (plaintiff's federal-court challenge to state disciplinary procedures was essentially an attack on her state-court disciplinary action and barred by *Rooker-Feldman*). The Court hastens to add that it is not holding that this case calls for the application of *Rooker-Feldman*; if it did, then the Court would have no subject matter jurisdiction over the motion and no power to act on it, period. Habeas review, however, is actually an exception to the doctrine. *E.g.*, *Levin v. Attorney Registration & Disciplinary Comm'n of Supreme Court of Illinois*, 74

---

[4]Of course, the Court is not saying that habeas relief is a matter of state law. "[A]ny correction for a federal constitutional violation must be consistent with federal law; [a petitioner] is not seeking habeas relief for errors of State law, but rather for a Sixth Amendment violation." *Williams v. Jones*, 571 F.3d 1086, 1092 (10th Cir. 2009). But because of *Lafler*'s emphasis on state trial court consideration of the plea, and because of federalism interests and state courts' experience with state pleas and sentencing, the Illinois Appellate Court should have the initial chance to evaluate whether its own plea decisions conform with both state law and federal constitutional law.

F.3d 763, 766 (7th Cir. 1996) ("A litigant cannot obtain collateral review of a state court judgment in federal district court absent specific congressional authorization," such as habeas relief under 28 U.S.C. § 2241). The pertinent point is that *Rooker-Feldman* "is concerned with federalism and the proper delineation of the power of the lower federal courts." *Nationscredit Home Equity Servs. Corp. v. City of Chi.*, 135 F. Supp. 2d 905, 916 (N.D. Ill. 2001) (citation and quotation marks omitted). The underlying concerns of federalism, comity, and the proper balance between state and federal courts steer the Court towards restraint in this unique procedural posture, because evaluating the state court's sentencing of Hudson would be akin to reviewing a state-court judgment.

Finally, this procedural course is further supported by the Supreme Court's "recognition of the need for a proper balance in the concurrent operation of federal and state courts," which "counsels restraint against the issuance of injunctions against state officers engaged in the administration of the State's criminal laws." *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974) (quoting *Younger v. Harris*, 401 U.S. 37, 46 (1971)). Commonly known as *Younger* abstention, this doctrine prevents federal court interference with ongoing state criminal proceedings. *Id.* This case, of course, does not involve enjoining state-court criminal proceedings, but abstention nevertheless reminds courts of "principles of equity, comity, and federalism that must restrain a federal court … ." *Id.* (citation omitted). In *O'Shea*, abstention prevented a federal court from deciding a Section 1983 claim asserting that the state trial court had an unlawful practice of deciding sentences, bonds, and jury

fees. *Id.* (citation and quotation marks omitted). The federal appellate court's proposed injunction, which would have allowed the plaintiffs to adjudicate the legality of future (hypothetical) prosecutions brought against them, would be "nothing less than an ongoing federal audit of state criminal proceedings" and would undermine deference and respect to state judiciaries. *Id.* at 500. Similarly, Hudson's case also raises the potential for a type of ongoing oversight of the Illinois state court. Suppose for example that this Court decided that the state court abused its discretion in weighing impermissible factors (or weighing them too heavily), and once again ordered the State to reoffer the twenty-year plea and the state court to consider it without making the same mistakes.[5] If the state court reconsidered the plea but rejected it again, would Hudson return to this Court to argue non-compliance? This back and forth raises the specter of ongoing lower federal-court review of a state-court proceeding. Instead, the next procedural step should be the Illinois Appellate Court. If, at the end of the state appellate process, Hudson still does not receive his requested relief, then he may file another habeas petition to argue that the federal constitutional remedy was not properly effectuated, and that he thus is in custody in violation of the Constitution. This approach is consistent with *Lafler*'s emphasis on state-court discretion and with federalism interests.

There is no easy answer to this procedural question, nor did *Lafler* say that there would be clear ways to figure out the remedy and its attendant procedures.

---

[5]Hudson also argues that the Court should vacate the conviction and order Hudson's immediate release. Pet.'s Corrected Br. at 1. But the Court declines to do so because *Lafler* explicitly allows the state trial court to first determine whether this remedy is appropriate. *Lafler*, 132 S. Ct. at 1389. Thus, the trial court's failure to vacate and release Hudson should also be evaluated by the state appellate court.

But the difficulty in figuring it out is, as *Lafler* implicitly recognizes, no excuse for never giving any remedy for ineffective plea advice. It is true that the Court's answer to the procedural question does place a burden on Hudson.[6] But equity— with its myriad factors and lack of bright-line rules—is a heavy responsibility, and fashioning and applying equitable principles in the state system first is more consistent with the state system's primary responsibility for state criminal procedure. Hudson's motion for further relief is denied.

## B. Trial-Court Discretion Under *Lafler*

It is plain that another important question after *Lafler* is what leeway a state trial court has in considering a reoffered plea (or in resentencing a defendant) after a federal habeas court has made a finding of ineffective assistance. Even though the Court ultimately need not decide the relevant factors that inform the exercise of discretion, it is worth discussing some potential considerations, because there is so little caselaw on the issue. (Of course, this discussion is not binding on the Illinois Appellate Court.)

Since *Lafler*'s issuance, very few courts have elaborated on the discretionary factors that a state trial court may consider when deciding whether to accept the plea, reject the plea, or approve a sentence in between the one in the plea and the one previously imposed. Hudson argues that "every single court considering a plea agreement in the *Lafler* context has accepted the plea, that is until the Circuit Court here." Pet.'s Corrected Br. at 20. Even if that is true (which it might not

---

[6]Hudson is worried about the time it would take to go through the state system. This is a valid concern, but he can move to expedite the appeal and, ultimately, that is the price of giving deference to the state system.

entirely be[7]), Hudson's cited cases provide little discussion about the remedy or about *why* the trial courts decided to accept the new plea.[8] Hudson also argues that the trial court's discretion is "extremely limited," and that "[o]nly extraordinary circumstances … could ever justify a court to reject a plea agreement in the *Lafler* context, leaving the defendant with no relief." Pet.'s Corrected Br. at 20. But the cited cases—*Lafler* and *Titlow v. Burt*, 680 F.3d 577, 592 (6th Cir. 2012)—did not impose an "extraordinary circumstances" standard.[9]

---

[7]In one post-*Lafler* state habeas case, the trial court rejected the reoffered plea, and instead imposed a sentence that was higher than the reoffered plea but lower than the defendant's previous sentence. *See Rodriguez v. State*, 470 S.W.3d 823, 825 (Tex. Crim. App. 2015).

[8]Petitioner cites the following cases: *Lafler v. Cooper*, 132 S. Ct. 1376 (2012) (plea accepted); *United States v. Wolfe*, 2012 WL 1957427 (E.D. Tenn. May 31, 2012) (plea accepted and defendant released); *United States v. Love*, 2012 WL 2921496 (N.D. Ill. July 17, 2012) (plea accepted and defendant released); *Soto-Lopez v. United States*, 2012 WL 3134253 (S.D. Cal. Aug. 1, 2012) (plea accepted); *Hines v. Ricci*, 2014 WL 314430 (D.N.J. Jan 28, 2014) (plea accepted); *Jacobs v. United States*, 10 F. Supp. 3d 272 (D. Conn. 2014) (plea accepted and defendant released); *White v. United States*, 2014 U.S. Dist. LEXIS 60038 (S.D. Ohio Apr. 30, 2014) (plea accepted and counts dropped); *United States v. Miranda*, 50 F. Supp. 3d 85 (D.P.R. 2014) (plea accepted and counts dropped); *Smith v. United States*, 2014 WL 4825369 (D. Del. Sept. 29, 2014); *United States v. Bennett*, 588 Fed. App'x 159 (3d Cir. 2014) (plea accepted); *United States v. Sain*, 79 F. Supp. 3d 696 (E.D. Mich. 2015) (plea accepted and counts dropped); *United States v. Merlino*, 2015 WL 3630919 (D. Mass. June 11, 2015) (plea accepted).

[9]In *Titlow*, the Sixth Circuit held that the petitioner was prejudiced by ineffective assistance when his attorney rejected a plea with a seven to fifteen year sentence. 680 F.3d at 583, *rev'd*, 134 S. Ct. 10 (2013). The petitioner was convicted at trial and sentenced to twenty to forty years. *Id.* at 584. As to the appropriate remedy, the Sixth Circuit required the state to reoffer the original plea agreement and for the state court to consider it. *Id.* at 592-93. The Sixth Circuit emphasized that "the state court's discretion is not entirely unfettered" and that "state courts must at least consult [ ] the initial plea agreement in crafting a new sentence for the defendant." *Id.* at 592 (citation and quotation marks omitted). In other words, "the state court should continue to recognize the former plea offer as a baseline … in fashioning the appropriate remedy." *Id.*

Although the Sixth Circuit "remain[ed] concerned that the remedy articulated in *Lafler* could become illusory if the state court chooses to merely reinstate [the petitioner's] current sentence," *Titlow* did not adopt an "extraordinary circumstances" standard or elaborate on specific factors for the trial court to consider. *Id.* Ultimately, because the Supreme Court reversed the Sixth Circuit on the ineffective assistance issue and concluded

Instead, based on the Court's reading of *Lafler*, it seems that the trial court's analysis should center on whether there are circumstances that would make it unjust to accept the sentence in the reoffered plea. *Lafler* approvingly discussed and cited to *Lockhart v. Fretwell*, 506 U.S. 364 (1993), which supports using overall fairness as a guide and being aware of awarding a "windfall" to a defendant. *Lafler*, 132 S. Ct. at 1387. In *Fretwell*, a jury sentenced the petitioner to death after relying on the pecuniary-gain motive for the murder as an aggravating factor favoring the death penalty. *Fretwell*, 506 U.S. at 366. Fretwell argued that his attorney was ineffective for failing to invoke an Eighth Circuit case called *Collins v. Lockhart*, which held that capital juries cannot consider pecuniary gain as both an element of the underlying crime (felony murder) and also during capital sentencing. *Id.* at 367. But the twist was that the Eighth Circuit had, by the time of the federal habeas litigation, overruled *Collins*. *Id.* at 368. The Supreme Court rejected habeas relief, explaining that although Fretwell would have received a different sentence but for his counsel's error, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Id.* at 369. Fretwell's original sentence was not fundamentally unfair because the decision that would have been the basis for relief (*Collins*) had since been overruled. *Id.* Put another way, "there are … situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate 'prejudice.'" *Lafler*, 132 S. Ct. at 1387 (quotation marks omitted) (quoting

there was no constitutional deprivation, it did not reach the remedy question. *Burt v. Titlow*, 134 S. Ct. 10, 18 (2013).

*Williams v. Taylor*, 529 U.S. 362, 391-92 (2000)). It is true that *Fretwell*'s analysis involved the prejudice element of an ineffective assistance claim, so it was set in a different posture. But the underlying principles described in *Fretwell* nonetheless inform the remedial phase, which is precisely why *Lafler* left this door open for the trial courts. A remedy must simultaneously "'neutralize the taint' of a constitutional violation … while at the same time not grant a windfall to the defendant," keeping in mind the overall objective of fairness. *Lafler*, 132 S. Ct. at 1388-89.

In that vein, appropriate considerations in deciding whether to accept a reoffered plea may include: the circumstances surrounding the offense that emerged during trial; new details about the petitioner's criminal history revealed in a PSIR; or other intervening circumstances that occurred after the plea offer. Aggravating facts about the crime or about the defendant that come to light after the initially offered plea are also relevant in deciding whether it would be unjust to stick to the terms of the original plea. For example, previously unknown evidence introduced at trial might show that the crime was carried out in a particularly egregious manner, or the petitioner might have committed serious crimes after the conviction in question. Or if the State made its original plea offer in order to (at least in part) protect the victim from having to undergo the trauma of testifying, but the case went to trial and the victim had to testify, then that too could bear on whether to accept the original proposed agreement (or instead require a deal that calls for a higher sentence than the original deal, but still less than the imposed sentence). Admittedly, if we could truly rewind the clock, then these factors might not have

been relevant (or known) in the first place. But as *Lafler* recognizes, it is a challenging feat to put the parties back in the precise positions before the attorney's mistake led to the rejection of the plea offer. *Lafler*, 132 S. Ct. at 1389. So while this hypothetical starting position may be the "baseline [that] can be consulted in finding a remedy," *id.*, it is not the *only* relevant position, because the remedy also should not "needlessly squander the considerable resources the State properly invested in the criminal prosecution" or "require the prosecution to incur the expense of conducting a new trial." *Id.* at 1388-89. The ultimate question should be what sentence would produce the most just result and best espouse "concepts of reliability and fairness." *Fretwell*, 506 U.S. at 368 (citation omitted).[10]

In addition, if the trial court decides that fairness mandates rejecting the sentence in the reoffered plea, the trial court should then consider whether it would accept a sentence in *between* the sentence in the reoffered plea and the sentence that the petitioner actually received. *See Lafler*, 132 S. Ct. at 1381 (during resentencing, the "[trial] court may exercise discretion in determining whether the defendant should receive the term offered in the plea, the sentence received at trial, or *something in between*" (emphasis added)); *Ebron v. Comm'r of Correction*, 53 A.3d

---

[10]Many of those examples involve facts emerging *after* the rejection of the plea, but *Lafler* also clarifies that the trial court may consider facts that arise at any point in time, including *before* the plea rejection. For example, a petitioner's previously known criminal history or "earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions" may be relevant. *Lafler*, 132 S. Ct. at 1385, 1389. Although these factors have already been considered during the prejudice prong—that is, they would influence whether the prosecution would have withdrawn the plea and whether the court would have accepted it—the prejudice prong requires only a "reasonable probability" of acceptance, and the trial court gets to decide, subject to the proper exercise of discretion, whether it will accept the reoffered plea. *Id.*

983, 993 (Conn. 2012) ("if there is no reasonable probability that [the trial court] would have imposed the sentence embodied in the plea offer after considering the PSI report or other unfavorable information," but "there is still a reasonable probability that she would have imposed a significantly less severe sentence than the sentence actually imposed [], and the petitioner would not have withdrawn his plea," then the trial court should impose a sentence that is higher than the one offered in the plea but lower than the sentence actually received); *Rodriguez v. State*, 470 S.W.3d 823, 825 (Tex. Crim. App. 2015) (trial court properly rejected the reoffered ten-year plea but accepted a twenty-five year plea, which was shorter than petitioner's former sentence of eight life sentences plus twenty-one years). So in reviewing the state court's decision in Hudson's case, the Illinois Appellate Court might consider whether the state court considered any sentence in between the twenty-year deal and Hudson's current natural life sentence. This is sensible because if a trial court was considering the twenty-year plea for the first time, that is, ten years ago during the initial prosecution, it is valid to ask whether the state court would have rejected *all* plea offers except one that dictated a mandatory life sentence, which would reflect the belief that mandatory life without parole was the *only* acceptable sentence.[11]

---

[11]It is true that the habeas opinion did not expressly state that the trial court must consider the possibility of an in-between sentence (if it were to reject the twenty-year plea). *See Hudson*, 2014 WL 4244255, at *9-10. But *Lafler* explicitly contemplates this option by explaining that during resentencing, "the [trial] court may exercise discretion in determining whether the defendant should receive the term offered in the plea, the sentence received at trial, or *something in between*." 132 S. Ct. at 1389 (emphasis added). The Supreme Court made this statement when describing the remedy of a resentencing on the same charges, rather than the remedy of considering a reoffered plea deal, but there is

With that said, there are also factors that a trial court *cannot* consider as part of its resentencing decision. For one, the trial court may not base its decision on any disagreement with *Lafler*, which announces binding principles of federal constitutional law: any "constitutional command is, like all federal law, binding on state courts." *Montgomery v. Louisiana*, 136 S. Ct. 718, 729 (2016). Similarly, in carrying out the remedy ordered by the federal habeas court, a trial court may not base its analysis on any disagreements with the underlying merits of the ineffective assistance claim. Relying on those factors would contravene *Lafler*.

A few final points are worth mentioning: first, by previously concluding that attorney Beck was ineffective, the Court was not in any way questioning his integrity and overall reputation, which the state court repeatedly sought to defend. *See* 12/29/15 Tr. 5:8-18; *id.* 6:9-7:20; 2/23/16 Tr. 17:4-12; *id.* 17:1-18:14. To be sure, "ineffective assistance" can be a harsh label because it can cover honest—though still unreasonable—mistakes made by busy lawyers, working as part of a burdened indigent defense system, who have the best of intentions. All courts recognize the impact in making an ineffective-assistance finding, but the seriousness of that finding is no excuse to shrink from it when the facts so dictate, nor is it a general character attack on the attorney. Second, in directing the state trial court to consider the reoffered plea, the Court did not imply that the state court should be a "rubber stamp" and automatically accept the reoffered plea, *see* 4/6/15 Tr. 8:22-23;

---

no hint that the Supreme Court meant for the analysis to be different in these two scenarios. Rather, the main difference between the two remedies is whether resentencing takes place with or without a newly reoffered plea deal, and not the discretionary factors that should be considered in figuring out the fair remedy. *Id.*

2/23/16 Tr. 8:5-11; *id.* 18:11-14, or that the state court should pretend that Hudson's criminal history did not exist, *see* 2/23/16 Tr. 18:4-9**.** Nor did the Court decide without deliberation that the state-court system was the one that had to consider the reoffered plea—*Lafler* commanded it. So this Court could not enter the relief directly by taking care of "all that nice stuff up there," 3/20/15 Tr. 3:5-6, or "just handling it [itself]," 4/6/15 Tr. 9:19-10:3. It is the role of all courts—both state and federal—to figure out how to implement the important constitutional command in *Lafler.*

## III. Conclusion

For the reasons explained above, Hudson's motion to enforce, R. 70, is denied. In view of the complexity of the issues, the Court grants a certificate of appealability under 28 U.S.C. § 2253(c), to the extent that one is needed in this context. Reasonable jurists most certainly could debate the interpretation of *Lafler* and the correct next procedural step. This decision terminates the motion and the case in the district court, so this is a final decision. And to ensure appealability, the Court will enter a separate Rule 58(a) document that states that the motion is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: July 13, 2016